Colorado. We will hear argument this morning in Case 23-975, Seven County Infrastructure Coalition v. Eagle County, Colorado. Mr. Clement? Mr. Chief Justice, and may it please the Court, NEPA is a self-described procedural statute. It is designed to inform government decision making, not paralyze it. Nonetheless, it has become the single most litigated environmental statute. The decision below helps explain why. Despite an environmental impact statement spanning 3,600 pages, including 20 appendices, that addressed major impacts, minor impacts, downline impacts, and cumulative impacts, the D.C. Circuit demanded more. It insisted that the Board study the future project developments in the entire basin, the prospect of accidents in train lines hundreds of miles away, and the effect on refineries in Gulf communities thousands of miles away. All of that is not just remote in time and space, but falls well outside the STB's limited remit. And it falls within the jurisdiction of other agencies that can address those issues comprehensively and concretely, if and when they arise. And the EIS here addressed almost all of those issues, or at least identified them. But in classic no-good-deed-goes-unpunished fashion, the D.C. Circuit held that because the agency identified the issue or flagged the issue, it was therefore foreseeable, and they had to do more. That's a recipe for turning a procedural statute into a substantive roadblock. After all, infrastructure requires investment, and for investors, time is money. Project proponents, by contrast, know that time is on their side, and a remand just for a little more process can kill a project. The combined effect of proximate cause and the rule of reason should have made this a straightforward case. The Board was not heedless of environmental effects here. It consulted with dozens of agencies, considered every proximate effect, and ordered 91 mitigation measures. Eighty-eight miles of track should not require more than 3,600 pages of environmental analysis. I welcome the Court's questions. Mr. Clement, to the extent that some of these issues fall in the jurisdiction of other agencies, what role would public citizen play in disposing of those? So public citizen, I think, instructs that when these issues are both remote in time and effect, and within the jurisdiction of other agencies, then the agency that approves this EIS is not the legally relevant cause, to use the phrase from public citizen, of any of the environmental effects. I think it's important to contrast the role of other agencies when it comes to things that are outside the scope of the project, because if other agencies have a partial role in issues that are within the scope of the project—here, for example, the Forest Service had to approve a right-of-way for the train—that is all taken care of in the consultation process. And here, there was consultation to a fare-thee-well. There were five other cooperative agencies. There were 27 agencies that were consulted. But it never occurred to the Board that they should consult with Port Arthur, Texas. And those issues that are far outside the proximate effects of the project, if other agencies have those within their jurisdictions, then they're going to be the legally relevant cause of upstream development in the basin if it takes place 10 years from now. If there's an accident in Colorado on the train tracks, that's an FRA issue, not an STD issue. And obviously, what's going on in the Gulf communities is issues for Port Arthur, Texas, or maybe the EPA. I don't know how to articulate your rule in writing. The NEPA itself says that it requires agencies to, quote, consult with any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved. So we can't write and say, you don't have to think about things that other agencies have jurisdiction over because the NEPA says that's what you've got to do. And I don't think you're saying that if the Department of Transportation wants to authorize a highway running near a wetland, that NEPA wouldn't require the DOT to consider the environmental effect on the wetlands, even though a different agency has primary jurisdiction over wetlands. So your generalized rule, I don't have to think about it if another agency has jurisdiction, doesn't make much sense in this statutory scheme. It has to be something more nuanced. I agree. And that's why my favorite rule is not just if it's another agency's jurisdiction, you don't have to look at it. But what I tried to articulate in answering Justice Thomas' question is if the effect's already remote in time or space and in the jurisdiction of another agency. I don't even know what that means because most environmental effects, like effects on wetlands, are going to be sometimes remote in time and geography. And even the restatement says on the issue of proximate cause, restatement third basically says time and geography are not at issue. If you've got a, if you put a car in the stream of commerce where you know after 1,000 miles it's going to blow up, it could go 1,000 miles and 40 states away and blow up. That's a reasonably foreseeable consequence that is remote in geography and time. These rules, these absolute rules or how we explain them really depend on each individual case. So why don't we go back to this case for a moment, okay? I think your basic proposition and the one that Justice Thomas was saying, how is this similar to power? And I see it as similar to power because I think what you're trying to say is this agency's charged with putting a railroad in place. Its obligation is to carry passengers and cargo. The nature of that obligation may downstream have an effect, but it doesn't affect the actual decision this agency is making about where to site that railroad. So it is a different agency that has to decide whether the extra production of oil somewhere else is going to affect the environment. And that's much closer to the power situation because that decision is not going to directly affect the agency's decision about where to site this railroad. So, I mean, I don't disagree with where you ended that question. I hope not. I was trying to help you. Well, at the end I think you were trying to help me. I think along the way you may have done some damage to the position. Sure, because you want absolute rules that make no sense. With respect, I guess you'll decide whether they make sense, but I think the lower courts are in desperate need of some guidance here. And simply to repeat public citizen to the D.C. Circuit that thinks public citizen means that the STB has to study the output of refineries in Port Arthur, Texas and Shreveport, Louisiana, I don't think it's going to be good enough. And I think the guidance you need to give them is to start with the project at hand, which is where you ended. This is 88 miles of track in northeastern Utah. And with respect to those 88 miles of track, there are consultation obligations, and they were done here to a fairly well. And when you're talking about something that the agency actually controls, they can really use NEPA in a very granular way. So in this case, they have a mitigation measure that's designed to protect six residents from noise pollution from the tracks. But when you lose sight of the project itself, and you start thinking about, okay, well, you know, this is going to lead to this, and it's going to lead to this, and might lead to this and this thing, then it takes you way outside the lane of this agency, and you make them consider things that are just not their job at all. And from the very beginning, the CEQ has been concerned that if these environmental impact statements balloon and become thousands of pages long, they become useless even for the things that the agency can control. So I think the test of saying if it's remote in time and space, and it's in another agency's jurisdiction, I think is the right test. But another way of looking at it would be to start with what's really before the agency. They're supposed to consider alternative routes, and they're supposed to consider mitigation measures. So... Sorry, Mr. Clement. Keep going if you're not finished. Well, I'll just finish the thought, which is, you know, if the environmental impact statement is focused on the project, it will inform. You can pick one route versus another, or the agency itself can impose mitigation measures. But if you have to look at everything under the sun, that's outside the ambit of the agency. I'm sorry, Justice. Yeah, no, I just was wondering whether we need a new test or whether the law in terms of what we have already said is supposed to be happening here is enough. And I thought curious the fact that your brief and your argument didn't rely on what this court has said about deference to the agency's own determinations regarding the scope of its authority. I mean, I understood that an EIS, based on what even public citizens said, is about the usefulness of any new potential information to the decision-making process. And the agency is making a determination about that. And so in CLEP, we said that NEPA analysis requires a high level of expertise and is properly left to the informed discretion of responsible federal agencies. So I was just curious as to your decision to sort of propose a new test outside of this deference framework as opposed to just saying, the problem here is that the D.C. Circuit did not give the agency sufficient deference as we have said they're supposed to do. So I think what's needed is a new test plus deference. And, of course, there was a little bit of division of labor here, and I think Mr. Needler is going to come to the podium and talk a lot about deference. And I suppose it may be true that if you restated public citizen, reaffirmed the rule of reason, reemphasized arbitrary and capricious review, and reminded the D.C. Circuit that the APA itself builds in harmless error review, you might make the world a better place. But I guess the problem from my standpoint and the standpoint of people that are trying to invest in these projects is all of that's on the books, and yet the D.C. Circuit and the Ninth Circuit hasn't gotten the message, and the agencies are kind of in this position where they don't really have a choice. They have to lard up these environmental impact statements to become thousands of pages because they know the challenge is coming, and it's not going to come in the Eleventh Circuit. The challenge is going to come in the D.C. Circuit, where all these agencies are based, and any EIS challenge can be brought. Go ahead. If I understood your test, it's like remote in time and effect, is that the... Plus outside the jurisdiction. Plus outside the jurisdiction. So I think I get outside the jurisdiction. What does remote in time and effect mean? I think it would help me if you applied it to this case and to the particular things that the agency should have considered under that and didn't have to consider under that. Sure. What I'm trying to do with remote in time and space is to get it outside of the realm of the project itself and the realm of where mitigation measures could be brought to bear or alternatives would make a difference. Because if it's inside that realm, then if another agency has some partial jurisdiction, that's supposed to be taken care of in the consultation process. So within the realm of the project, for example, here's this 88 miles of line, and railroads are going to cross it, and wildfires are going to start as a result. Is that within time and space? Totally. And within that time and space, they're not just supposed to be... They're not supposed to say, well, we're the STB, all we care about is railroad commerce, so we're not going to talk to the local officials or we're not going to talk to Fish and Wildlife or other agencies. All that took place here. It's just that once you get outside of that, now you're thinking about... And the pollution that those trains are going to cause, that's also time and space, within the time and space? Yeah, yeah. Within the confines of those 88 miles. But then as you asked me to apply it to this plan, so now you're talking about tracks that are 500 miles away that have already been there, that are already regulated by other agencies. And then the question is, like, what is the STB supposed to do about it? And I think the answer is not much, because they're not in a position to mitigate there. I mean, the reason they can put mitigation measures on my clients is because they're going to own and operate that 88 miles of track. Are you saying that anything that falls outside these 88 miles is not their problem? I'm saying that anything that is outside that 88 miles and is in the jurisdiction of another agency is not something that should be fatal to an EIS. I'm not saying that the agency can't take it into account. And I think one of the problems with the D.C. Circuit's approach is it actually kind of has this no-good-deed-unpunished flavor where if the agency says a little bit about down-the-line traffic or a little bit about where this sort of waxy crude is going to go, then, aha, it was foreseeable. So now you have to study it to a fairly well. And so I think the way I'm thinking about it is you can't be reversed as the agency for something that is remote in time and space plus in another agency's bailiwick. Thank you, counsel. I wanted to just ask you about what I think you just started to touch on. I have trouble seeing how this is going to work out as a practical matter. If you're at the agency or counsel for the private party, I mean, what are you going to do? You're going to say, okay, I've identified this possible issue, but I think it's too far away. I mean, do you counsel your client to say, well, you better put it in because they might decide that it's not too far away? Or do you counsel your client in saying, well, I think that's remote enough, so don't put it in? I mean, it seems to me that it's hard to figure out what you should require as a matter of law when an agency is going to, or your client in front of the agency, is going to put enough in, I would say, sort of no matter what. Like if you come in and whoever's advising them and say, this might be included, I think you'll want to address it. Otherwise, you're making judgments and have a higher risk when you go to court to say that this should have been addressed and wasn't. I agree, Mr. Chief Justice. And in some respects, I think it would be helpful to sort of distinguish between that which can get an agency reversed and that which is something that is available to the agency. And Congress in this Builder Act has provided direction to the agencies that they should try to knock these environmental impact statements out in 150 pages. I mean, that's going to be impossible unless there is a reaffirmation that you don't have to look at things that are not within the immediate ambit of the project and are in another agency's lane. And I think that could promote better decision-making in the long run because I think if you look at the 91 mitigation measures that were imposed here, and that's on top of 56 voluntary measures, if you stick to the 88 miles of track, you can be incredibly helpful and you can direct my clients to consult with the Railroad Safety Administration and you can direct them to consult with local agencies to make sure that the crossing, where the railroad crosses the road, has the right signage, or where the railroad crosses the water, that it's done in a way that protects the environment, including where that stream is going to go next. Mr. Clement. Thank you, Counsel. Justice Thomas, I think we'll go. Mr. Clement, would you just briefly state, with respect to the 88 miles, what your test would be? So my test would be, as to the 88 miles, that there is an obligation on the agency to cooperate with other agencies that have necessary permits and to consult with other agencies that have expertise to bring to bear on the project itself. And that happened here. There was cooperation with four federal agencies and Utah, and then there was consultation with 27 federal and state agencies and the Ute Tribe. All of that happened. Among the many sins that the D.C. Circuit found in this case, there was no sin in terms of not doing enough consultation. That's what you need to do with the project. But how far down line or upstream or downstream should you look? You should stop there. And you should understand, and let's just take the three things that they were faulted for. So upstream development, that's all in the future, and that's going to be permitted either by Utah or the Ute Tribe, and they're going to have their own environmental review. So the next thing that they fault us for is down line. It's about 500 miles in Eagle County, Colorado. That's already regulated by other agencies, and that's track we don't even own, so we can't mitigate there. And then the last thing, kind of the cherry on the proverbial sundae, is Gulf community environmental quality. And, again, that's in the regulatory agencies of those local communities. They can affect it directly. They could expand the refinery. They could shut it down tomorrow. It would be perverse to say, you know, let's put the kibosh on 88 miles of track in northeastern Utah because of an effect in a community when the community itself can regulate it directly. Justice Alito? Could you just say a word about the relationship of the tort concept of proximate cause to the test that you're asking us to apply? Yes. I think there are two things that are relevant from proximate cause principles. One is the principle that this court already derived in Public Citizen from Prosser and Keaton, which is the idea that when you're looking at proximate cause and tort, what you're trying to figure out is who's the legally responsible party. And so you apply that in Public Citizen. Obviously the FMCSA was not the legally responsible party. It was the president's determination to let the trucks in subject to the safety inspections. And here the legally responsible party for all of these disparate things are the agencies that will ultimately regulate them directly. But the other principle, I guess I would almost think of it as like a cross check, which is if you think that if you sort of try to restate the EIS violation in tort liability claims, if it doesn't even come close, if it doesn't pass the straight face test, then I think you're expanding the NEPA too far. Thank you. Justice Sotomayor? I think that my colleague Justice Jackson had a point that is hard to get out of in addressing this case. And it's not the argument that you've made in your brief, but it is embedded in the argument you're making here. This agency did look at all the reasonably foreseeable impacts. So it's not a question of did it fail to look at something. The only qualification to that might be the effect of the railroad on the Colorado River. That's a separate issue, okay? But it did look at the impact upstream and downstream. So the question before us was, was it arbitrary and capricious for it not to consider something more? But that's not how you want us to rule. You don't want us to say it wasn't arbitrary and capricious because what it did was enough and why. You want us in the process to create rules that say, even though you said to the contrary a little while earlier, the agency can choose to look at almost anything. The question is, if it says, I've looked at it, but it won't impact my views, is that arbitrary and capricious? So to be clear, I mean, you know, I'm here in front of, you know, on the behalf of seven counties that want this project to move forward and an investment group that, you know, got streamlined approval for this track in 2021. So if you want to reverse the D.C. circuit and say this environmental impact statement is sufficient, based principally on arbitrary and capricious review, I'd be delighted. But I do think we're here at least in part because the lower courts are divided on this issue and need additional guidance. So I'm also trying to be responsive to that. And I think the way to be responsive to that is to say, focus on the project. Focus on the 88 miles and do your consultations. But they did. And yet still we're here thanks to the D.C. circuit that's faithfully applying public citizen. Justice Kagan, I'm wondering whether your test sounds pretty good for this project, but may not sound quite as good for other projects in the sense that, like, your project is 88 miles. So focus on 88 miles. And that sounds big enough. Thanks. But, you know, suppose that the project is just a single facility. I mean, you wouldn't say just focus on the one square mile that that plant is, right? I mean, you would acknowledge that some kind of plant can have effects that are far broader than just the, you know, 50 acres on which it sits. So how does your project work in any number of other sorts of projects that might be much smaller or alternatively might be larger, like a FERC pipeline or something? So I think it's a fair question. I think that in reality, I think the lower courts haven't actually struggled much with the smaller projects. And they've been able to understand that, yeah, you look at, I mean, you look where the smokestack, you know, and the smoke goes and you don't just like, you know, look at the boundary of the property, but you keep focused on the project. And I don't think it's an accident that the lower courts that have approached this more the way that I would like them to have largely been dealing with in the context of Army Corps projects, where it's a pretty discrete project. And they say, yeah, this is, you know, we'll look at how it affects the immediate environment. But the fact that it actually facilitates phosphate mining, that's not something we're going to look at. That's somebody else's problem. I think, you know, the FERC pipelines are probably the hardest case because, you know, And I think they're less remote in the sense that, you know, the pipeline might go all the way to the near a power facility. And the D.C. Circuit has this Sable Trail case, which we don't like very much. And we would say even in Sable Trail, pipeline goes to the plant, but the emissions of the plant are regulated by Florida. And so that's a case where you don't have to study the greenhouse gas emissions. That's our position. But you can disagree with us on that because you think our test would apply a little differently to the pipeline. But I think our test is a pretty good start. And look, you know, in the realm of defining proximate cause, if I could give you a 10-word test that took care of every hard case, I mean, you know, they'd give me tenure at Harvard. But I think, you know, having I'm sure they'd give you that anyway. But I think if you move it in the right direction and maybe note that, yeah, maybe this is going to play out differently. Maybe, you know, you have to take another NEPA case someday in a pipeline. I think that would still move the ball in the right direction. Can I go back to Justice Alito's question about how this relates to proximate cause? And, you know, in Metro Edison, we clearly said that there is an analogy to proximate cause concepts, and we're supposed to sort of think about those concepts kind of. But it also said, kind of. It said, like, whether you would be held liable in a tort suit is not the right inquiry. And are you suggesting a change in that view, or are you copacetic with it? Call it a refinement. And my refinement is exactly what I told Justice Alito. I mean, I think the principal thing that you've already derived out of proximate cause is this idea that you've got to think about who's the legally responsible party. And that's what proximate cause does in general. And that's why, if there's another agency, if we're miles and miles from the project and there's another agency that's supposed to be focused on it, if something goes wrong, they're going to be the legally responsible party. And then the other thing I think is useful is just as a crosscheck. I mean, nobody in their right mind would say that a project in northeastern Utah is the legally relevant cause or the proximate cause of additional pollution in Shreveport, Louisiana. Nobody. And if it's not even a close case, then the analogy has got to be useful. And the problem is my friends on the other side describe proximate cause principles as a fundamental mismatch, and that's pretty unfaithful to metropolitan Edison and public citizens. Thank you. Justice Kavanaugh? Can I ask you about the nature of judicial review and the nature of deference? Arbitrary and capricious review, of course, is deferential, but it does have both a procedural and substantive reasonableness component. When we're talking about NEPA, it's purely procedural. So how should we think about the role of the court applying deference to something that's purely procedural? How does that affect what we normally say about arbitrary and capricious review? I mean, I would say that if anything, that calls for an even lighter touch. And if you're thinking about, I mean, who is better than the STB to decide what it needs to consider and what's outside of its ken or what it can sort of usefully study and what it can usefully not study? So I think there, because it's procedural, you probably want to be even more deferential. And then I do think it's always worth remembering the sort of due regard for prejudicial error point of the APA. And so in a case like this, you know, if you think that the agency didn't perfectly study something it didn't have to study, boy, that just seems to me to be the quintessential application of a harmless error type principle. And so I think if you added all of that to the test that I'm suggesting, I think we would have a much better situation and we'd be much closer to the situation Congress seems to want and the CEQ initially envisioned, which is you didn't have encyclopedias, you had relatively tight environmental impact statements that were focused on the alternatives and focused on mitigation measures and things the agency could control. What do you think we should say about Sable Trail in this opinion from your perspective? I think you should say that it's wrong, but if you want to reserve the pipeline question or something, I think what Sable Trail has come to be known for is worse than the decision itself, which is this notion that as long as the agency mentions something, that makes it foreseeable, and therefore they have to do more. And I think part of the problem with the D.C. Circuit's approach, and I would respectfully suggest my friend's position here, is that they want to decouple reasonably foreseeable from environmental effects. And as the SEC's brief says, those are either separate requirements or they clearly tell you that just being reasonably foreseeable is not enough. There's nothing more reasonably foreseeable than once the FMCSA and Public Citizen gave the final regulations for inspections, those trucks were coming across the border and they wouldn't be great for air quality this side of the border. That was all reasonably foreseeable, but this court said no, not the legally relevant cause. And then last, just a bigger picture question of how to think about NEPA more generally. When NEPA was enacted, or since NEPA was enacted, there have been all sorts of amendments and new environmental statutes, and you've alluded to this in your comments so far, that so many different agencies are involved, so many different environmental checks are in place on land, air, water, pollution. What is NEPA adding to the substantive statutes, and how should that affect how we think about NEPA in terms of what the judicial role is with respect to enforcing NEPA? As it's currently applied in the D.C. Circuit and the Ninth Circuit, NEPA is adding a juicy litigation target for project opponents. What should it add, properly construed? Well, I think it should be more focused on the project at hand, and NEPA challenges, you know, the universe of situations where the NEPA challenge is successful, but the substantive environmental statute challenge is unsuccessful, should be a pretty small universe, and it should either be pretty egregious violations of the scope of what they should be looking at, or, you know, you can also have NEPA violations where they've made a consultation error, which we don't have here, or there are situations where you have a scoping, or the segmentation problem where they break up a project into a bunch of little projects and only do EAs and not EISs. So, like, there still would be a role for NEPA in this kind of narrower view, but I do think that sort of historical perspective is important, because when NEPA was first passed, there were very few substantive environmental statutes, and so it was really designed to make sure that the agencies weren't heedless of the environmental consequences. Now, with all these substantive environmental statutes, I don't think an agency could possibly be heedless of the environmental consequences. Thank you. Justice Barrett? So, this dovetails with Justice Kavanaugh's questions. I mean, NEPA is a procedural statute, and as you mentioned, now with the amendments, we've shrunk down to pretty significant page limits, and now you're looking in the neighborhood of 150 and you have judicially enforceable deadlines. So, you're shrinking from the thousands of pages, like the report in this case. What effect do you think those procedural requirements are? I mean, it's going to be impossible for agencies to consider as many downstream and upstream effects as they did in this case just because of the procedural constraints. So, what can we add, or do you see that? I mean, obviously, this case happened before the amendment, but what can this add to that, or how can it dovetail with that? When we have an eye looking forward to the amendments. Yeah, and I suppose if you remanded here for additional NEPA analysis, that would be subject to the statute. So, I think the statute is highly relevant. I mean, I view the fact that it slimmed things down as a feature, not a bug. And I think, to me, what would be most useful is reaffirming the principle that this court has already said, which is the purpose of this thing is largely to inform the agency. But in the context of NEPA in particular, what it should be informing the agency about are the environmental qualities of the reasonable alternatives that they're supposed to consider, and the CEQ itself is called the heart of the EIS, is the analysis of the reasonable alternatives, and the mitigation measures. And all of that is going to be naturally focused on the project at hand. And all of that is like 150 pages ought to be pretty good to tell you that, yeah, Route 3 is better than Route 2, and Route 3 will be even better if you adopt the following, however many mitigation measures. All of that, I think, can make an 150-page EIS still be valuable, and frankly probably more valuable than a 3,600-page EIS. Follow-up on the proximate cause questions you've already answered. I mean, I had taken your brief to take a harder line on proximate cause than you have today. So, are you soft-puddling proximate cause? It's hard for me to see when I think about how an opinion would write if you win. Is it you start with proximate cause and then you ask, well, should we go a little bit beyond this, maybe applying a rule of reason? Or are you still kind of pushing, maybe I misread your brief, are you pushing for a harder proximate cause line? So, I mean, I think I'd go where this court went, which is proximate cause maybe isn't the alpha and omega, but it sure is helpful. And then I do think, having ruminated on the question a fair bit, that maybe the best thing that you could say is if it is remote in time or space, which gets at proximate cause principles, and in the jurisdiction of another agency, then you're outside the consultation requirement and you're talking about something that if things go wrong years from now, the STB and this project is not going to be the legally relevant cause. Maybe it'll be poor management by the Federal Railroad Administration or the wrong speed limit in Colorado, or maybe it'll be because Port Arthur, Texas, actually likes having refineries because it's the best thing for their local economy. But you're not going to say 88 miles a track in northeastern Utah is the legally relevant cause. So you see it as saying what we've said before, but maybe putting a little bit more flesh on the bone with your remote in time and place language as kind of the measure of when you go beyond proximate cause? Is that how you would? But I would emphasize that if it's in the jurisdiction of another agency and remote, that really means it's not the legally relevant cause. Because another way to explain the split is some people look at public citizen and they get just what I've told you out of public citizen. Other people look at public citizen and they say either that's a case about the president, or they say that's a case where the last agency to act had no discretion whatsoever. And I think that way narrows what public citizen should stand for. So in a sense, if you make clear that public citizen and its test for the legally relevant cause really looks to another agency that's in a better position to regulate it, and it's not just like a ticket for one train, sorry, the fun, then I think that will have a lot of help. And do you see your position as inconsistent with the government since they don't really kind of, I don't want to say go as far as you do, but they don't articulate the same test. So how do you see the daylight? I don't think there's a lot of distance or daylight between our positions, but I think what daylight there is reflects the fact that my clients have to invest money, and they need predictability. And so the idea that, you know, there are all these factors, but don't make any one of them too dispositive, don't provide too much guidance. I mean, you know, I love almost everything in the government's brief, except when it says context-specific or, you know, a factor but not dispositive. People who are actually trying to invest in these infrastructure projects need a little more clarity on that and a little more assurance that they're not going to get hung up for years and years based on litigation in the D.C. Circuit and the Ninth Circuit. Thank you. Justice Jackson? So I guess I think that my concern with your test, the remote and time-infected plus outside the jurisdiction, is that it feels to me to be unmoored from the purposes of NEPA, which you have, I think, articulated correctly as to informing the agency with respect to its own decision-making process. So I'm trying to figure out how to best articulate the concern, but your focus is on identifying who is legally responsible if this were to go wrong, as if NEPA is about solely mitigation measures. I thought NEPA was about the agency who has some responsibility over an aspect of this project, determining whether or not to approve it. And it's got to take into account not only the environmental consequences of the actual building of its piece, but whatever approving its piece is going to have happen in the environment broader than that. Now, I understand that's really hard to do. It gets far afield, and we can fight about the extent of that. But your argument, looking only at the 88 miles, I think might narrow in too closely for a purpose of really informing the agency about its approval of this piece of the project. So I'm going to disagree, and I'm going to disagree. I mean, I think you've identified there's a difference in sort of what you just articulated and the position I think you should adopt. And I think the position you've articulated I don't think is really consistent with 150-page EISs. And I think one way to articulate the difference is I think part of the problem with that is that views the agency underneath it, whatever its organic statute power, because that sort of suggests to every agency that they can put the kibosh on a project for reasons that have nothing to do with the details of the project or their own jurisdiction. But, no, I mean, isn't that where we come in? I mean, that's where I say, that's where I say deference and where the court has previously said deference is supposed to be taken into account. And, you know, advocacy, right, there are people who appear before the agency and explain to them that the statute actually presumptively says, in this case, you're supposed to approve agency. And, you know, if you're like arbitrarily saying, no, you can't do it because of something that's happening 200,000 miles away or whatever, then we're going to go to court because that's a problem. And I would expect the court to recognize that under those circumstances. But what I worry about with your test is that you're suggesting that the agency can't even look at the, you know, effects of the project outside of the very piece that it has sole responsibility for. And I don't know that NEPA was actually designed to be that narrow. So, just two responses. One is, what I'm saying is if they look way outside their bailiwick, it's not that they can't do it. It's that they shouldn't get reversed for not doing it well enough or for not doing it. Fine. And the second thing is... But your test suggests they can't or they shouldn't or they're not allowed to. No, no, we tried to say both in our briefs and here. If the agency wants to go beyond what's necessary, I mean, have at it. Try to be brief. But I guess what I'm asking is why isn't what's necessary anything that would reasonably affect its own decision about whether or not to approve its piece? And that might be things outside of exactly what the environmental impact of its piece is. That's where you're saying you've got to cut it off there. And I'm just suggesting that if we focus everyone's attention on what an agency should reasonably be taking into account with respect to its own approval of this 88 miles, whether it's the 88 miles themselves or the other environmental impact downstream or whatever, I don't understand why it can't be broader if we focus everyone's attention on the standard being what Public Citizen says, based on the usefulness of any new potential information to the decision-making process. So the reason I think you shouldn't go down that route is because I think that takes you to a world where an agency that maybe has effectively a veto over a project can consider everything under the sun and essentially use NEPA to be almost like a veto and take into account everything that the project is the but-for-causa. I appreciate that, but that's not this case. In fact, you agree with the agency in this case, and we don't have a situation in which the agency has not taken into account. It's the D.C. Circuit, I thought you said, was the problem here. The D.C. Circuit is the problem here, to be sure. But the agency obviously was reacting in part to what the D.C. Circuit has required and where the litigation would be. And if you just think how far outside their mandate is, because you talked about they're really about these tracks, but they not only are bound by but enforce a common carriage requirement. And if you think about this project, almost none of the problems with this project have anything to do with the trains. They have to do with the cargo. But the irony of this is the one thing this agency couldn't do as a mitigating measure is say, don't carry any of that waxy crude on your trains. That would clearly violate the statutory mandate. So I think rather than focus on every environmental thing that might happen if the agency went with the no-action alternative, I think if instead they focus on, look, what's going to make a difference between the reasonable alternatives that actually accomplish what this project is about and what mitigation measures can we put on those reasonable alternatives, whichever one we pick, to make this project more environmentally friendly, I think that accomplishes a lot. It doesn't make NEPA the end-all and be-all of all environmental policy, but that's actually as it was intended and certainly I think what Congress was getting at in the Builder Act. Thank you. Thank you, Counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. This Court's NEPA decisions over the last 50 years have announced principles that are designed to enable an agency to concentrate its environmental review on environmental issues that the agency considers most useful in its evaluation of the project. That decision is reviewed, as has been said, under the arbitrary and capricious standards, but there are particular reasons under NEPA for that deference. There are two more in particular. One is that this Court's discussion of NEPA constantly refers to reasonableness, reasonable rule of reason, reasonably foreseeable content, actions, and reasonable cause. Is it a reasonable cause of the action? When an agency is charged with acting under a statute that calls for reasonableness, that in itself suggests a broad amount of discretion for the agency to focus on what is actually going to affect the outcome. And the last point with respect to the procedural nature of NEPA, Vermont Yankee is very instructive on that. It says that a court is not supposed to impose procedures on an agency that go beyond the APA or, in this case, to the extent NEPA has a substantive element, it should not be imposing on the agency outside measures of what should be considered. With respect to the substance of NEPA review, it might be helpful to think of it in two steps. The first step is the court's review has to be grounded, in the first instance, in the action agency's organic statute. What does it permit it to do? And secondly, what is the particular issue before the agency? Here, answering that question is almost dispositive because of the unique nature of this program. The STB regulates railroad transportation under a common carrier mandate. It does not regulate oil. It doesn't regulate the commodity on any train. It does not regulate oil and gas development. And at the other end, after the oil is offloaded, it does not regulate refining or any other particular use of the product. So in this case, the NEPA review is concentrated or guardrailed, if you will, by the very nature of the statutory provision. In other places, that may not be true where you don't have that barrier. The next thing is I think you can condense all of the various tests or phrasing that the court has used into the one, is there a reasonably close causal connection? And looking at that question, there are certain formulations or ideas or notions that coalesce into that final point. Is it reasonably close in time or distance? I think common sense suggests if it's not, that that's not a reasonably close causal connection. And here, the oil development in the basin or the emissions from refineries down the road are not going to happen for quite some time because that will depend on individual decisions by lessees of land in the basin about where they're going to drill. And those are individual decisions. And they're also correspondingly, those decisions are subject to the review of other agencies, state, local, the lessor. And then downstream, the oil is not going to arrive there until after the drilling occurs and it's loaded on the trains. That's in the future. STB can't control where trains go. Individual decisions of the purchaser of the oil and other things will direct where it goes. And it may go to different refineries at different times. So you have both the distance there and the fact that it's subject to other regulation. And it's wrapped up in this or instructive that STB can't do anything. It can't prohibit any of the things I just discussed. And also it will happen so much in the future that the agency can't mitigate whatever consequences there may be. I welcome the court's question. Mr. Kneedler, Mr. Clement said that there was some difference between the government's arguments and his. And he didn't articulate fully what that difference was. Would you spend a few minutes on that? Yes. I think the principal difference is I think he primarily wants hard and fast rules, rigid rules. And I understand the instinct. And as, you know, the department defends a lot of lawsuits challenging NEPA decisions by agencies. And we wish that the courts would give more deference along the lines that I just described. Having said that, I think it's not really right to say there should be absolute rules. The mix of the factors that I mentioned may push you in one direction or another, or in some cases the statutory mandate that the agency has will be virtually dispositive. But you can't just focus, in this case you can focus on the 88 miles because that's really all the work to do. But in other situations, it's been settled for a long time that an agency should take into account indirect effects, too, which are not just the immediate effects of the project. Well, so could you put some flesh on the bones of that, just thinking concretely about Mr. Clement's test, which is this remote in time and space and within the ambit of some other regulatory authority? What are the circumstances in which you would worry about that kind of test? Or what are the circumstances in which you think that kind of test would be terrific and would help everybody out? And I think both can be true. You could have a situation where another agency could regulate something, but there's no petition before it or there's no action before it. And the federal agency might think that it will have external consequences, it should consult with that other agency. But that doesn't absolve, not in this case, but in another case where the agency isn't so confined, that can't absolve the agency from taking some account of what's going to happen. And, you know, one example is like in highways, the Federal Highway Administration and the funding decision will look not just at the highway, but what development is likely to occur if it's close in time. But if the highway is going to facilitate something that may be five years down the road or ten years down the road, then maybe not. So, you know, I think it does or in the Corps of Engineers permitting situation, Mr. Clement mentioned where the Corps of Engineers has a minor role in regulating the discharge. It shouldn't have to get into what other agencies are. So I think I'm not getting where you would think that test is not getting to the core of the problem. Well, if you there are other situations. We're focusing here on infrastructure projects because that's what's before us. But you could have land use decisions by a federal agency where there's a lot, a lot more is within the ambit of the federal agency to control. And maybe when you cut timber, there could be some emissions that would go off site or something like that. But another agency may take account of or maybe not. But it wouldn't be wrong for the landowner to say in deciding whether to approve a project, I'm going to consider the emissions, I'm going to consider those other things because of I feel like I have a special responsibility or a broader ambit because I'm leasing my own land. And, yes, maybe another agency could step in, but the agency would still feel some responsibility. Isn't that overlapping jurisdiction? I had understood Mr. Clement's test to be if it's in the jurisdiction of another agency and so there's nothing that here the STB could do about it. But what you're describing is maybe I'm misunderstanding what you're saying, but is what you're describing when there's overlapping jurisdiction so that the agency like the STB or whatever, the Federal Highway Administration could consider it, but so could another agency. Or they both should consider it. If there's overlapping regulatory jurisdiction, they both should consider it. But there are also situations where another agency has great insight in what might happen, technical expertise or something that the action agency could consult with. Now, here, as I said, there's pretty stark separation for what the STB does or what it's responsible for. But how is that different from Mr. Clement's test is, I guess, what I'm getting at. I mean, is the situation you're talking about when another agency has insight that it can offer, are you envisioning a situation in which there's not overlapping jurisdiction or it is overlapping jurisdiction? Well, here there is really not. I know. Mr. Needler, isn't the answer it's not overlapping regulatory jurisdiction, but the landowner with the timber has to decide under NEPA what informs their decision as to whether to chop down the timber. And so even though they may not have jurisdiction over the area in which the emissions would fall, you would still expect that they would take into account that they would look at, that they would study in making their own determination about whether or not to cut down the trees on their land. Right. And in some situations, even on federal land, there may be situations where another agency would also have jurisdiction. But that I understand. I understand. I'm not really disputing Justice Jackson's point here. I guess what I'm just trying to understand is nailing down the difference. I'm not hearing a ton of difference between Mr. Clement's test and yours on the jurisdictional point. Yeah, I don't think there is. As he said, I think we agree that sometimes the principles he's announcing will be dispositive or close to it, close to a rule. But we think the court should preserve the possibility or the likelihood in some cases. Well, maybe this is unfair, but can you, so far in which you've been talking about the relevance of the agency's jurisdiction, but if you add in the other element to the standard that he mentioned, remote in time and space, can you think of situations, past cases or situations that you can anticipate where both of those factors are present, where you think that his proposal would go too far? Well, I guess it depends on what you mean by remote in time and place. I mean, one of the differences that I think I have on the way Mr. Clement was articulating is, he said, he was saying focus only on the 88 miles. But NEPA has long been understood to require assessment of some indirect effects. Direct effects are normally what is happening on the 88 miles. So that's what I think I'm trying to get at is where. I mean, in what context would it be wrong to focus so clearly on just the 88 miles or just the area around whatever the project was? Well, I think where the agency is setting in motion something that is going to have effects off the property or out the driving cars or future actions that might be taken because of the development that I mentioned. And the Robertson decision from this court sort of instructed on that. There was a question of whether the agency should grant a permit to build a ski resort in the mountains. And then it was foreseen that there would be hotels and whatnot next to it. And the agency properly considered not just what was going to happen on the federal land that was being leased, but what private development would happen. And if it's right next door, that's close in distance. Maybe it would take a while to build the project. And so that's a matter of the agency's judgment is about what should be taken into account. But that's not remote in time and place, right? I mean, that's close in place. I was responding to the point that sometimes an agency should take account of something that isn't directly. It's not just the place. It's not just the ski lifts. I agree. I agree. It just seems like that's not. I mean, so I think like the 88 miles just focusing on the track itself might be too narrow a focus. But if it's something kind of alongside either in your hypothetical, it's something that seems to me pretty close. Right. That was my point about indirect effects. It's not the ski resort. It's not the ski lifts itself. It's what indirect consequences that will have by building the ski resort there or maybe a mile away. So it's a question. I guess what Justice Barrett is saying is, you know, it depends how you define the term remote. But I wouldn't think of that as remote. So I would think of that as passing Mr. Clement's test. Is there anything that you're worried about that's not like just around there but really is further away that the agency should really take a look at because it could influence their decision making? Well, I think the Corps of Engineers in issuing a permit for deposit is not just going to look at or shouldn't just look at the immediate place where there might be fill put in the river, but should be concerned if whatever pollutant is being added, what's its effect downstream going to be? Is it poisonous? Would it affect drinking water downstream? That goes to the issue of the nature of what the impact is, correct? Yes. And some impacts can be more localized and some impacts might not be. A smoke snack might be blown because of the winds in a particular area to five states. In another, it might be blown to two. And the same thing you just mentioned that if it's affecting the water, you can't just look at the little pond that's there. You have to look at where it travels when it leaves the pond, correct? And it could go a very far distance in some situations, correct? Right. And you can have downhill motion that could take something miles away.  So that's why a test that just speaks about the local impact is not enough if that's all you're saying. Right. No, I think that's right. And Mr. Clement was concerned about context-specific analysis. To some extent that's inevitable, but what I think we mean by context-specific is looking at the statute that the agency is acting on, what is it supposed to be focusing on and enabling the agency to focus on that in the particular decision that is being made. Sometimes that focus will be informed by the fact that another agency is also going to look at this. Another agency will be concerned about the downstream effects. Thank you, counsel. You obviously focused on a lot more adjectives or nouns, particularly in your opening, to determine what exactly is available here. And then I think a lot of the questions were pressing along the same direction. In light of all that, I think the most important question is going to be whether or not the agency will entertain motions for extension of the 150-page limit. How in the world-putting aside whether the question for people in the agency is how in the world is somebody going to know how they should use a very, very limited, in terms of government work, page limit. And in each term, knowing that failure to address a particular item could result in the project being either delayed or denied. And you sort of gave yourself the safety valve. Well, in this case it is very clear, and in this case that. But in other cases you have left a lot of uncertainty, both for the agency and the people appearing before it. Two responses to that, and there may be more. The first is that the page limit, I think, should be a statutory affirmation that the agency shouldn't have to go to the ends of the earth to decide the environmental issue. It should focus on what are the core concerns, identifying what the core concerns are, so that the agency will have that in mind and then decide how deeply it needs to go into that. So I think enabling, as this Court's decisions have sought to do, enabling the agency to focus closely on what it regards as most material to its decision. The second point is the other, I think, problem that comes up in judicial review is the fly-specking, which really isn't present here, but is more present in the other aspect of this case in terms of down-line effects, where the track is going through another state. Courts review these very intensely and say, oh, you should have done another study, or you've got this problem over here that you could have talked about more. And I think it's not really present in this case, but I think the courts need to be reminded, and again, this comes in with the reasonableness review and Vermont Yankee and arbitrary and capricious, need to be reminded that the agency gets to decide in the first instance with great deference how deeply it needs to go into something. And if somebody comes in with a saying, well, you know, you didn't, there's another study you could have looked at, at some point this just has to be cut off, particularly given the page limits and given that what NEPA was about was focusing on the things that are most important, which may include, does include, some indirect effects. Thank you, counsel. Justice Thomas? Justice Alito? Justice Sotomayor? What do you understand to be the issue before us? There were a lot of decisions by the court below, at least five that I'm aware of. One was on sending it back for the railroad to consider the additional oil production in the basin, and the other that the railroad would spur oil refining in Texas and Louisiana. And your brief was limited to those two. That's what we focused on because we didn't understand the question presented to cover the downline. Neither did I when I read the surface issue. But having said that, because they don't mention the other things, the wildfires, the railroad accidents, or the Colorado River impact, you don't think those issues are before us? I don't think, no, I don't think that they are before you. And the precise issue, I think, before the court with respect to both the oil and gas development and the refineries is whether, was it arbitrary and capricious for the agency not to have done more? On both ends of that, it identified the aggregate. It identified a low and high range of how much oil would be produced based on the capacity of the rail line and the aggregate amount of emissions that would happen in Louisiana. Just so I'm clear, the other items, the wildfires, the accidents, and Colorado River were not mentioned in the surface issue? No, I don't believe that. No, the agency obviously did evaluate those along the 88 miles. The question is whether it had done, and it did evaluate those things downline. This is an example of flyspecking because the respondents said, well, they should have done a little more. They should have done a little more. Thank you, counsel. Justice Kagan? Justice Kavanaugh? I want to pick up on what you were saying to the Chief Justice and in some of the colloquy you were having earlier, because I think there's an important distinction to be made between what an agency can do or maybe should do as a matter of good government and what the role of the courts is in reviewing what the agencies do. And we start with the deference on the arbitrary and capricious standard, but given the uncertain lines that were reflected in your answers to Justice Barrett and Justice Kagan and Justice Jackson about how far to go, it seems to me the deference of the courts has to be huge with respect to how the agencies think about the scope of what they're going to consider. And it seems to me the problem that has crept in is conflating what the agency can do and should do from what the role of the courts is here, and by the courts taking an overly aggressive role, it's in turn created an incentive for the agencies to do 3,000-page EI environmental impact statements. I think that's absolutely correct, and it's no coincidence that almost all of this Court's cases about NEPA have been where a court has required the agency to do more than the agency concluded in its own judgment was necessary. And so I think the Court could accomplish a lot in terms of NEPA litigation by emphasizing the points that you just did. Again, it's not manufactured. This Court has said reasonableness is the standard in measuring how far an agency should go, and who better than the agency in the first instance to say, this is the decision that's before us, this is what I need or what I think I need to consider that, to have considered environmental issues enough to go forward with a decision. One other point about the arbitrary increases. Sometimes agencies treat the EIS as if it's agency action that they should independently review. The ultimate question is whether the agency action should be set aside because of some defect in the EIS. In the end, analytically, the EIS is not its own agency action. It's part of the record on which the agency is acting. So if the Court finds some defect in some detail of the environmental impact statement, not only does that not render the whole EIS invalid, but you have to ask a further question. Should we be setting aside the agency's decision on the basis of something in a document? It's a very important document. But, again, it shows in judicial review some attenuation between what the EIS does and what the agency's substantive decision is. Just to underscore something that I think you're going to agree with, the new Act makes it impossible for the agency to do the kind of detail that some courts have demanded. So the deference squared with the new Act, it seems to me, but... Well, it does exempt appendices from that. I know. I know. Yes. But I think it's like... Don't try that here. I think it's like saying we're going to get around the wordlement by putting it in the... But an agency has to be able to document technically some of its judgments. But I do think that that would ease the task of judicial review because it necessarily will focus the decision in readable, understandable forms and force the agency to give its most important reasons and a further detail for some hydrological studies and whatnot that can be dealt with in the appendix. So I think it can be a useful separation of the agency's explication of its reasons and what should be the primary focus. Last quick thing. What do you think we should say about Sable Trail? I think it's a close question, frankly. The government argued that FERC was not required to evaluate emissions at the other end. There is a difference between this case and FERC pipelines because in this case, once the STB doesn't control where trains are going to go, that's all left up to private decision making. When you have a pipeline, the FERC is authorizing the pipeline to take gas from here to here. And so if you had the power plant right at the end of the pipeline, it would be sort of hard to say that that's not an indirect effect, at least of the pipeline. But we are very concerned, as Mr. Clement is, once you start expanding that. In Sable Trail, there were five refineries it could go to. And so the courts tend to look at that as a factual question. If you could figure out where it's actually going to go, you should investigate it. I don't think that's the right way to look at it or not the full way to look at it. Because legal responsibility, they're not responsible for which particular refinery it's going to go to. Justice Barrett? Just one quick follow-up on that because that was my question, too, about Sable Trail. You know, Mr. Clement said, well, at least what Sable Trail has come to stand for. And would the government agree that even if Sable Trail itself was correct for some of the reasons that you say, that what courts have interpreted Sable Trail to mean has true ground? Yes, and that's what I was trying to convey, because that gets you into speculation. It gets you into other agencies are responsible. It gets you into individual decision-makers and all that. Justice Jackson? So I'm reflecting on your conversation with Justices Kagan and Barrett. And maybe I don't understand how Mr. Clement's test works. But I thought that each element operated independently to narrow the circumstances in which further study would be required. So right next door, but within the regulatory jurisdiction of another agency, I thought would not pass Mr. Clement's test because he had a separate element about it has to be in your own jurisdiction. Is that how you understand? Yes. I think it could be understood that way. I'm not sure he means the hardest form of that. But maybe he can respond. That's how I thought. I thought. That sort of highlights. Highlights the concern, right? Because it could be right next door. It could be clearly a foreseeable impact. But he, I thought, wanted a line that had everybody looking at what is in your own regulatory jurisdiction. So it's not an overlapping jurisdiction scenario. He posits to begin with that different agencies have different purviews. And if this thing, step one, is outside your purview, you don't have to study it. Right. And that's like putting blinders on to something that may happen. And instead, your test, which seems to, I think, reflect what the Court has said about deference to agencies and what Justice Kavanaugh was pointing out about the arbitrary and capricious standard, you said in your beginning that we're supposed to start with the organic statute. And I hear that as sort of the step one court question is, has the agency properly identified its own purview under the statute? Once the agency does that, then the agency makes a determination about what it needs to study to inform its decision. And then you said at step two, the court asks, once the agency makes that determination, is there a reasonably close causal connection in time and distance to the thing that the challenger is saying the agency is supposed to study versus what the agency itself has said given its organic statute? Do I sort of have your framework right as to what courts are supposed to be doing? On the second step, I would add one modification. Yes. It would be, was the agency arbitrary and capricious in concluding that anything further than that should not be regarded as a reasonably close causal connection? I don't think that's a test for the court to decide in its own. In its own. Filter that through the arbitrary and capricious. Right, because it's one aspect of the agency's decision. It's both the organic statute and NEPA. How do they fit together? And given that, did the agency make a reasonable, was it arbitrary and capricious in making the judgment it did that going further than that? So in the government's position, if we were to articulate something like that, do you think that would be, that meaning these two steps, that this is the way the court is supposed to be looking at this in these situations, would that be helpful? Yes, I think it would be very helpful for the NEPA litigation that we do see. And then identifying the factors that can reasonably go into what's a reasonably close causal connection. And this is what the agency is looking at. And was it on those sort of factors, was it arbitrary and capricious? Thank you. Thank you, counsel. Mr. Jay. Mr. Chief Justice, and may it please the court. Petitioner's argument in this case has shifted somewhat from the search stage, as Justice Sotomayor's colloquy with my friend brought out. And I'd just like to focus on two of those at the threshold. One is about the 88 miles, and one is about the outside the agency's jurisdiction point. That the agency itself did not take this outside the 88 miles view. The agency reviewed and found foreseeable the downline impacts. We obviously don't think those are within the question presented, but it's striking that petitioners are taking a view of what the agency should have studied that is considerably narrower than the agency itself. And the second is about the agency's jurisdiction. This case came to this court as a case in which the D.C. Circuit had recognized that the agency had jurisdiction and authority to consider the effects that were being studied. So as petitioner's position has shifted, I think it's also lost any grounding in the text of DEPA. So I think it would be good to step back to there. The impacts at issue here are reasonably foreseeable consequences of this $2 billion railway project, whose entire rationale is to transport crude oil. Reasonable foreseeability is the test that has been in NEPA since the beginning, and that Congress has recently reaffirmed in the Builder Act. In that statute, as in agency practice leading up to it, when an effect is within the scope of reasonable foreseeability and within the agency's authority to consider, Congress doesn't direct agencies to pass the buck to someone else. It directs all federal agencies to cooperate on, where possible, a single environmental review so that federal decision-making from the threshold is informed by these environmental considerations. Congress also addressed these policy concerns that Mr. Clement has emphasized quite vigorously by adopting the page limits, the time limits, and also some scope limits that haven't come up this morning. We agree with a number of the things that the government said in its brief, in particular points B-1 and B-3 of its brief. I think you'll find more agreement with what I've said than Mr. Needler was able to get to today. Thank you. Thank you, Ron. I welcome the Court's questions. Would you just articulate what you think the close connection is with the Gulf Coast communities? The reason that the refining effects are reasonably foreseeable in this case, and I think probably would not be in some others, is that the very purpose of this project is not only to bring a specific type of crude oil to the National Rail Network, but to transport it for refining, and there are only a few places that have the capacity to do that. That's why the agency itself was able to identify the limited number of places where this oil could go. Again, the whole raison d'etre of this project is to transport one commodity and one commodity only. That won't be the case in many other railroad projects, but I do think it's a little bit misleading for Mr. Clement to suggest this is an 88-mile railroad as if the train just went back and forth for 88 miles. It's a connection to the National Rail Network whose entire purpose was to bring this crude oil to the market. Do you think, as a common carrier, that this agency could say, we don't like oil refining, and hence, because it creates pollution, I'm not going to build this railroad because the crude oil will lead to oil refining that will pollute the environment? Let me just say, as a preparatory matter, I think that would be a question about the agency's organic statute and not about NEPA. I suspect that it probably could not because of the common carrier mandate. So if it can't, which is what I assume, because the statute doesn't permit it to discriminate in that way, it says you have to carry oil products and cargo in persons, then why is it within their purview to say or determine what the increase of refining will be and whether it will be damaging when there's another agency that has the power to control that? It has no power to say, don't refine the oil. Another agency might do that. The purpose of the NEPA review on this point, I'd like to make three points. One is that the board is weighing the transportation merits of this project, whether to authorize this project as a substantive matter, against the environmental consequences. That's the test that the board applies under its organic statute. And so when the board concludes that a railway project is... But it's not the carrying that causes the pollution. It's the refining that causes the pollution, and the railroad can't control that refining because it can't prohibit it. It could stop it by not permitting the shipment, but it's not entitled to make those choices. It's a common carrier. It has to carry the goods. I think that as a matter of its organic statute, it might well take that approach. Isn't that what it did here? No, I don't think so. I think that what it did here is closer to something that you said a moment ago, which is to say essentially we, this agency, don't regulate the refineries, and therefore we need not look at the consequences. And I think that that's inconsistent with what NEPA requires because... Thank you, counsel. Just very briefly, NEPA requires agencies to look at even harms that they cannot mitigate and harms that they do not regulate directly, precisely because they provide a springboard for public comment to the agency. So even if the agency doesn't think that it would conclude that the environmental harms outweigh the transportation merits, it allows the public to participate in the process, and it also allows those local air pollution regulators that you referred to, Your Honor, to essentially be aware of the consequence coming downstream. So that, if I understand you correctly, Mr. Jay, that takes NEPA outside of the things that are reasonable to inform agency decision-making and says even if this thing wouldn't reasonably inform agency decision-making, couldn't reasonably inform agency decision-making, still NEPA might impose an obligation, has an interest in public airing of that matter, and that seems to go beyond what I thought the statute was all about. So that is not our position, Justice Kagan. We're not saying that NEPA requires the agency to conduct environmental review that wouldn't inform its decision-making. That's an important aspect of where I began, that the D.C. Circuit concluded, and as the government pointed out in footnote 7 of its principal brief, nobody sought cert on the question whether these effects were within the agency's authority to regulate. So public citizen is an excellent example of the point that the agency is not required to study what it has no authority to act on. But public citizen is different. I mean, it has the authority, the board here has the authority to decide whether or not this 88-mile track is approved, right? Yes. And the question is, I think, that Justice Kagan is asking, to what extent does information about what happens in the refining process inform this board's determination with respect to exercising that authority? I don't understand why it matters if, as Justice Sotomayor pointed out, they're a common carrier, they're not allowed to discriminate as to what gets carried on the tracks. So if they can't say what gets carried, then what difference does it make that the refinery is putting out environmental effects to their decision as to whether or not to approve this? So it matters because it is a reasonably foreseeable consequence of this railway project because of what these trains will carry, and because one of the things that NEPA requires agencies to do is to look at the foreseeable consequences, even when they cannot be mitigated. I mean, that's in Section 4332c.2 of the statute. Any reasonably foreseeable adverse environmental effects, which cannot be avoided if the proposal should be implemented. That's part of the study. And so, in other words, for the agency to say, well, we don't have authority to mitigate these effects, and therefore we won't look at them at all, that is ignoring a category of consequences. Don't you have to have an argument that their study, let's say they do study them, and they determine they have great impact. Doesn't someone have to make the determination that those impacts should really matter with respect to whether or not this project gets approved? I mean, they're so far down the line. They depend on a bunch of other people's actions. All the things they say. Don't you have to show that there's some pretty close connection or tie between those impacts and this decision? So I want to distinguish between two points. One is the far down the line point, and I think the foreseeability standard deals with that. And the second is the thrust of your question, which is, would the agency look at it? And there certainly are cases where agencies either don't take environmental considerations into account or they don't take certain environmental considerations into account. But the effects in this case, and we've been talking a lot about refining, but there are obviously multiple categories of effects in this case. These are the types of effects that the board, in conducting this broad weighing between transportation merits and environmental consequences, does take into account. Take the downline consequences. The board has an entire regulation about the environmental consequences of permitting a new railway, which will then have trains go onto the national rail network and go onto other tracks. It has an entire regulation directing applicants to explain the environmental consequences for other areas, for things like air pollution. Obviously, the board doesn't regulate air pollution, but it absolutely does take into account the consequences on other rail lines of adding new rail traffic. The downline impacts in this case, which the board studied but made basic APA errors on. You don't appreciate a difference between the downline impacts of having more train traffic in certain areas versus what is being carried on those trains and what then happens to that cargo. So I think the standard is foreseeability for both, but I do think that it will be much more rare for the trains to be carrying a single commodity for refining for consumption in a single location. That, I think, is what makes this case a particularly unrepresentative example of the foreseeability standard, because in many cases, as the D.C. Circuit acknowledged, whatever the commodity is, whether it's on a train or in a pipeline, it will go into some national distribution network and no one will know where it will go, how it will be consumed, whether it will displace other goods. I think the D.C. Circuit made that point in distinguishing one of its own precedents involving natural gas. But in this case, the entire purpose of the project is to carry waxy crude oil. And the record before the agency shows that every train that leaves the Uinta Basin is going to be carrying waxy crude oil, every one. And the board was able to quantify both the amount of oil that would be necessary to make the project financially viable and to identify where it would go. So if the board has essentially tracked the oil out of the basin, onto the trains, and to the refineries, what the D.C. Circuit pointed out is that since the agency was also assuming that all of the oil would be refined, it needs to tot up the environmental consequences at the refinery. In many cases, that will not be the case, but that's why the reasonable foreseeability standard is met here. Do you think that the agency could turn down the project on that basis? I take it you must because you were assuming that the agency couldn't mitigate the harms by saying you can't carry this particular product. Do you think that the agency can turn down the product? Is that the sort of assumption that's underlying what you're saying? I think that is the assumption on which the D.C. Circuit decided the case, but that's not a NEPA question, obviously. It is a question of the authority under the ICCDA. It seems related to a NEPA question because if the agency can't mitigate the harm and it can't turn down the entire project, one wonders what all this fuss and bother is about. I think the D.C. Circuit understood that these were the types of considerations, and certainly the downline impacts, I think probably the upstream impacts as well, were the kinds of considerations that did motivate at least one member of the board to dissent from the decision. So as the case came to the court and as the question presented is framed for you, that is not the question. That's taken as a given. Can I ask about foreseeability? Because foreseeability is certainly part of the inquiry, but you're seeming to make it the entire thing, and if it were the entire thing, public citizen couldn't have come out the way it came out, where it was perfectly foreseeable what environmental effects were going to flow from those trucks. So I guess I'm wondering, it's got to be more than that, right, Mr. Jay? It is more than that. So the government has this mantra in its brief about attenuated, speculative, contingent, or otherwise insufficiently material. We actually agree with a lot of that, that things that are too attenuated or speculative for the agency to look at, those are excluded by the foreseeability standard. And then setting it even separate and apart from the foreseeability standard, this is almost sort of the flip side of Mr. Clement's position. Mr. Clement seems to be saying that if somebody else has authority to look at it, this agency shouldn't. So our position is if this agency doesn't have authority to look at it, it is not required to. And then the third point is that they obviously have to be environmental in nature. That was the thrust of Metropolitan Edison that some things are not environmental consequences at all because there's no causal relationship between the agency action and the effect on the physical environment. So I think each of those is part of the analysis, but quite a bit of it is accomplished by the reasonable foreseeability standard. And I think that it's important to distinguish between two questions. One is how much process should the agency give the things that are within what NEPA tells it to look at. And much of Mr. Kneedler's presentation focused on that. And we agree 100% that agencies have a lot of discretion to say, we're going to prioritize these effects over others. We think that's the necessary concomitant of the Builder Act and the 150-page limit and the time limit, that agencies are going to have to prioritize some effects over others. They will get deference if they explain briefly what their reasoning is for doing so. That could have to do with their statutory mission. It could have to do with their expertise. But what Congress did not do is say that it was going to attack the problem of NEPA having too broad a compass by changing the reasonable foreseeability standard. And that's the problem with what Mr. Clement is proposing, is that he's saying that even where the agency finds something reasonably foreseeable and says, we should study that, and in that study it makes a basic APA error, like the one that the Court of Appeals in this case found to be utterly unreasoned. Mr. Clement says, no problem, harmless error, because NEPA didn't require you to study that at all. And that, we think, is the wrong way to attack the problem, because the reasonable foreseeability standard is in the statute, and this sort of alternative not-my-problem standard is not. If anything, as Justice Sotomayor brought out at the very beginning of the argument, the text of the statute directs agencies not to ask, do I have the statutory authority to mitigate this issue? It directs the federal government together to bring together all agencies that have jurisdiction by law or special expertise with respect to any environmental impact involved. And so Congress built on that in the Builder Act by specifying that, where possible, there should be one environmental review, precisely because that is how environmental review is better streamlined, rather than fragmenting environmental review. Why do you say that the agency here didn't do anything? I thought there were 50 pages of their EIS that was dedicated to the environmental consequences of new oil and gas drilling and refining. So the upstream development, I think it's a curious case, Justice Jackson, because, as you say, the agency took quite a bit of time looking at certain aspects of upstream development, and in those 50 pages they indulged the project sponsor's assumption that the railroad would be viable because there would be enough oil developed for it to be carried to market and make the railway a financially viable going concern. But then, with respect to a couple of categories of impacts, what the agency said was, well, these are not within our authority to mitigate. We don't regulate oil and gas. So we're going to look at it, but we're only going to look at it where it's near the rail line. And what the D.C. Circuit said was that that distinction is based on, one, something that's not driven by NEPA, this point that we've been discussing, about whether agencies should look at environmental effects that they don't regulate directly, and two, whether it made any sense as a matter of the APA. And so the agency did look at upstream development and, as a factual matter, agreed with the predicate that had been laid for looking at all those things, such as about how many wells will be needed to generate about this much waxy crude oil. We're not, in this case, asking that the agency look at things that it can't look at without knowing where individual wells would be. Obviously, as the agency said, that would be speculative. But that's not what's at issue. What's at issue is the foreseeable consequences of oil development at that scale. And recall that the agency elsewhere in its EIS assumes that all of the oil shipped out on the rail line would be new oil development. So, in other words, it's not substituting for oil that's currently being developed and shipped out by truck. When you make those assumptions, then it follows that the agency should be looking at at least the basin-wide effects of the oil development because they're reasonably foreseeable, and that is the applicable standard. And the agency's response to the comments basically just stopped based on this notion that those aren't things that it regulates directly. I'd like to turn for a moment to Mr. Clement's allusion to the idea of prejudicial error, and I think that that certainly is a standard in the APA. But this case, I think, illustrates why that would be of great concern. I think it's a bedrock principle under the APA that when an agency tackles an issue, it's supposed to respond to it in a way that is not arbitrary and capricious. That obviously is a deferential standard, but it requires an intelligible reasoning that is subject to appropriate judicial review. And what Mr. Clement is proposing in this case is to say that no matter the utterly unreasoned nature of, for example, the agency's handling of the downline impacts, and no matter the fact that the agency did not read this to be outside the scope of NEPA because it's not within the 88 miles or for any of the other reasons that Mr. Clement was offering, that the courts should decide that as a matter of substantive NEPA law, I guess, those errors are per se harmless. And I think there's both a NEPA problem and a Chenery problem with doing that. The NEPA problem is that it doesn't apply the actual foreseeability standard in the statute, and that where the agency has concluded that effects are foreseeable and that it should or indeed must tackle them, that to have the courts come in and say, no, that's not what's required, I think should require a higher standard and not a lesser one. And the second is a principle about Chenery, which is that this is essentially, not even the government is here defending the agency's rationale. To have Mr. Clement defend it on a rationale that the agency did not itself adopt, I think, is a further problem. We've talked a little bit about the basic thrust of NEPA, and I want to get back to a question that Justice Kavanaugh asked early on, which is what is NEPA adding in this suite of environmental statutes? Because as you observed, NEPA was the first of a great many environmental statutes. It was adopted in 1970 before a number of the agencies that we now know existed. And Mr. Clement seemed to be suggesting that, well, its importance has eroded over time, but what hasn't eroded is the text, right? And that the text sets out a requirement that to the fullest extent possible, all agencies are to follow these basic NEPA procedures. One of those NEPA procedures is to take environmental considerations into account in deciding on major federal actions. There obviously are limits on what is a major federal action, but what NEPA requires is that they follow that procedural guide to making better decisions. And precisely because at the time NEPA was adopted, a number of agencies might well have said, not my problem, I'm just a highway agency, I'm just a railroad regulator, and not taken environmental considerations into account, when they might well have been able to mitigate or avoid environmental problems had they done the proper degree of study. Sometimes, and this goes back, Justice Kagan, to our colloquy a few minutes ago, sometimes that might lead the agency to say, we're not going to approve the project at all because the environmental consequences are too great, and it is consistent with our mission to turn the project down on that basis. More often, we think, the study of environmental consequences is going to lead to public comment, informed decision-making, and where possible, consideration of mitigation. That's exactly what NEPA sought to get at. I think the concern raised, though, is when the agency has said, has approved the project, and a court comes in and says, in this new, as you say, suite of statutes era, and says, even though the agency approved the project, even though the project and all the effects comply with all the substantive environmental laws that have been passed over the years, which regulate very extensively, obviously, we, court, are going to come in and second-guess. So I don't think your answer focused on that particular problem and the deference, given that maybe it's just extra deference given the overall situation now. Maybe extra is the wrong word, but just appropriate deference. So I think that where an agency recognizes that there is an environmental issue and that it will be dealt with in the mitigation process, or, sorry, in the review process by other agencies, which could be state or federal agencies, that rationale might well be sufficient all by itself to satisfy NEPA review. But what we're discussing here is a different question, which is whether the ring fence around NEPA should be drawn so tightly that the agency doesn't have to ask that question at all. As I said a moment ago, and I think this really is one of the most important pieces of this case, that how much the agency has to do under NEPA is different from saying that certain effects are beyond the scope of NEPA so that Mr. Clement's aggressive view of harmless error can come in and fix an agency's flawed decision-making on grounds that the agency itself did not give. That, I think, is the core of the point, that even where some other agency has responsibility, that agency is going to be at the table in the NEPA review. The first agency may well be able to rely on the agency with expertise in the NEPA review. And the flip side of that, as this is made explicit in the 2023 amendments, is that where the first NEPA review answers these questions, the second agency can look back to the first NEPA review and say, we're all done here. We don't need another one. Mr. Jay, can I just give you a chance to answer what I think is the hardest part for you? And that is, if the environmental impacts come from the cargo that is to be carried on these trains and the board cannot, because of the common carrier mandate, really consider the cargo or discriminate on the basis of the cargo, then how is it that these environmental impacts are useful to the board's decision-making in the way that NEPA requires? So, as we've been discussing, there are three general sets of impacts. And I don't think that, for example, the wildfire set of impacts along the downline stretch, I don't think that's driven by the cargo. So let's bracket that for the moment. I think that in many cases where you're building a railroad and the railroad will carry whatever all comers want, whether it's passengers or freight, then the board would be justified in saying, this is a common carrier line. It would be totally speculative to ask what cargo it will carry. In this case, it's not speculative at all, because the entire purpose is to carry one set of cargo. And if you look at the record, you will see that... Would the board be justified in saying, we know what this cargo is, and because we can't discriminate on the basis of our common carrier mandate, there's no impact on our decision with respect to NEPA or whatever, and so therefore we don't have to study it. So I think probably in the context of a project like this one, where the board's mission is to weigh the transportation merits against the environmental consequences, and the transportation merits are heavily weighted with the oil development in the basin, the economic value that it will create, and the ability to unlock this important natural resource. We're not saying that the board would conclude that the environmental consequences are too grave to permit the railway as a matter of law or something like that, but we are saying that what environmental consequences would result foreseeably from carrying one cargo to particular destinations in very large quantities, that's foreseeable, whereas as the board said about the other things that might go along on this rail line, we don't know what they might be. It would be speculative to wonder what they might be, but we do know that there will be no trains carrying anything else. Let me say that more precisely. There will be no trains carrying cargo other than oil and only cargo other than oil. Every train leaving this basin is going to be carrying waxy crude oil. There might be one car tacked on for something else if there were a market for it. And so under those circumstances where the rationale for the project is to permit unlocking more waxy crude oil development and where the board's consideration of the benefits of the project is tied to that oil development, it follows that the board would at least consider what the environmental consequences of doing so would be. Thank you, counsel. Justice Thomas? Justice Alito? Justice Sotomayor? I do see that there are different questions here. You mentioned the train accidents and the wildfire or pollution. I don't think Petitioner has ever said the agency should not study those things. Those are directly caused by the train, the project. Mr. Clement said that this morning.  After the 88 miles. That's a different challenge as to whether they did it adequately or not, which is what the D.C. Circuit said. They didn't do it adequately. That's the question of purely an arbitrary and capricious standard, correct? It is purely arbitrary and capricious. All right. The issue of whether they had to study at all the increased oil refinery is the issue that's before us, correct? Whether they had to address the environmental consequences of developing the oil in the basin and of refining it at the point of delivery. All right. Thank you. Justice Kagan? Just on that, if I could get you to focus specifically on Mr. Clement's test and say what you think is wrong with it. I understood Mr. Clement's test, and he will tell me if I'm wrong, but that it's a kind of two-part test. If it is both remote in time and place and another agency has regulatory authority, then you can't fault the agency for not looking at it. And so, again, Mr. Clement will tell me if I'm making his test more stringent than he would like it to be. But it's two parts. If both are satisfied, you can't fault the agency. What's wrong with that? Two things. Let me start with the other agency's authority piece first. I think Justice Barrett brought out in a colloquy at the beginning about whether agencies sometimes have concurrent authority, and the answer is yes, they absolutely do in a lot of cases. And therein, I think, lies the problem, that Mr. Clement's rule would say agency number one, pass the buck to agency number two. It's not clear that agency number two would then say we're going to do the study rather than pass the buck to someone else. And I think that that's directly in the teeth of NEPA and the provisions for timely and unified federal review, like the one document provision at new section 107B, that all the agencies with expertise or jurisdiction, either one, are supposed to be participating in the NEPA review and to coordinate. So that's one piece. The second piece you asked me about is the remote and time and space point. And I think, obviously, our test likewise, the statutory test, would likewise rule out some things that are remote in time or space. But just as foreseeability doesn't have a strict geographic line, I think Mr. Clement's rule, by making it strictly geographic, that's not really tied to the concept of the project. Projects in our large federal government, and especially multi-billion dollar projects like this one, may well have effects that are felt beyond just next door. And I think that the fact that Mr. Clement says that the only rail line between this railway and the Texas refineries, so in other words, every rail car going to Texas or Louisiana, they're all going to come out of this railway, they're all going to turn left, and they're all going to go down the Union Pacific line, but Mr. Clement says, well, that's too remote in time or space for our test to bring it in. We think that the foreseeability test makes that a really good example. It is very, very foreseeable that the rail cars that come off of Mr. Clement's 88 miles of track and turn left are going to cross that rail line. And the agency itself foresaw that about once a year, there's going to be an accident with an oil-laden car, and about one out of every four of those is going to result in an oil spill. Thank you. Justice Kavanaugh? Justice Barrett? Justice Jackson? Thank you, Counsel. Thank you, Your Honor. Rebuttal, Mr. Clement? Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, Justice Kagan, you understand our test perfectly, and the reason it has both elements is to deal with this situation of concurrent jurisdiction or to deal with a situation where another agency has information that bears directly on the project. And that's why if you look at the mitigation measures that were adopted, both the voluntary ones and the ones imposed, they talk about the other agencies that are involved. And other agencies were directly involved here. The most obvious is the Forest Service that provided a right-of-way, and all of that took place in the cooperation and consultation process. Twenty-seven agencies were consulted, and nobody's complaining about that. That's why it's a disjunct, or that's why we have to have both elements there. But if it's remote in time and space, and it's in another agency, you don't put them in the consultation process, and you let them deal with the process. Second point I'd like to make is just to be specific about what's wrong with Sable Trail in addition to its decision to disregard FERC's judgment that the EIS there was enough. First of all, it decouples reasonable foreseeability from environmental effects, and that's what the respondents do as well. As long as it's reasonably foreseeable, it's foreseeable that it goes down the tracks 500 miles. Never mind that once it gets there, the safety regulation is the job of a different agency. The tracks are no longer operated by my clients. The tanker trucks on there are owned by a third party. It's got nothing to do with us. If there was an accident there, FRA would come in, they would talk to lots of people, and they wouldn't talk to us because we have nothing to do with that downline accident. So that's one thing that's wrong. The other thing that's wrong is it has this formula that if you think about it even a little bit, then it's foreseeable, then you have to study it to death. That creates all the wrong incentives. The last point I would make is just about what's before you. I think the entire environmental impact statement and whether or not you have to consider effects that are not proximate and are in the jurisdiction of another agency is properly before you. The question presented doesn't distinguish between downline and downstream. I don't even know what that exactly means. There's not a stream here. So I would think you look at all of the things that the D.C. Circuit faulted this agency for, and the downline impacts are not materially different. Indeed, both the refining in the Gulf and the extra traffic on the train tracks in Colorado depends on the idea that there's going to be more upstream development in the basin. This basin is not some small area. It's as big as the state of Maryland. And all of that is speculative. If a project happens and there are concerns with the vegetation or whatever, then either the Ute tribe or Utah can make a determination. They can impose their own mitigation measures. The last thing I'll say is if you're worried about sort of trying to provide some additional detail to what's remote in space and time, I do think the scope of the reasonable alternatives and the scope of the mitigation measures provides a good guide. But this is a common carrier agency. The one thing it could not do is say let's mitigate by saying no waxy oil in these trains. It just doesn't make a lot of sense to make that agency responsible for combustion in the Gulf. Thank you, Your Honor. Thank you, counsel. Case is submitted.